IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Jennifer Buttaccio, | ) | |
|     Plaintiff, | ) | Case No: 16 C 5447 |
| | ) | |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| | ) | |
| Nancy Berryhill,[1] | ) | |
|     Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion, and Plaintiff's motion for summary judgment [7] is granted. Civil case terminated.

## STATEMENT

**Facts**

Plaintiff worked full time as an occupational therapist until October 2010, when she went on short-term disability leave. (AR 21.) She then returned to work as an occupational therapist for five hours per week between May 2011 and September 2011, but had to stop working for health reasons. (*Id.*) Plaintiff then worked from her home as a data entry clerk between March 2012 and June 2012, at which time she stopped working completely (*Id.*) She applied for disability insurance benefits on October 10, 2010. (AR 19.) Her claim was denied initially and on reconsideration. (*Id.*) Plaintiff testified at a hearing before an administrative law judge ("ALJ") in October 2014, after which the ALJ issued a decision concluding that Plaintiff was not disabled and denying disability benefits. (*Id.*) On March 25, 2016, the Appeals Council denied review, so the ALJ's decision is considered the Commissioner's final decision. (AR 8.)

**Background**

Under 42 U.S.C. § 405(g), a Social Security claimant may obtain judicial review of any "final decision" of the agency by suing the Commissioner in a federal district court within sixty days following notice of the agency's decision. The Court has the power to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing" the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, as the defendant in this suit.

agency's decision. *Id.*

The Commissioner follows a five-step inquiry in evaluating claims for disability benefits under the Social Security Act: (1) whether the claimant is currently employed (*i.e.*, engaged in substantial gainful activity); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

Here, the ALJ determined that Plaintiff: (1) has not been engaged in substantial gainful activity since the alleged onset date of April 15, 2010; (2) suffered the following severe impairments: chronic fatigue syndrome; fibromyalgia; degenerative disc disease of the cervical spine; interstitial cystitis; and adjustment disorder with depressed mood and anxiety; and (3) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.). The ALJ then evaluated Plaintiff's residual functional capacity ("RFC") and concluded that while Plaintiff could not perform any past relevant work, she could perform sedentary work, as defined in 20 C.F.R. § 404.1567(a) and which involved occasional stooping, kneeling, crouching crawling and climbing ramps and stairs. (AR 61.) According to the ALJ, Plaintiff could not climb ladders, ropes or scaffolds nor have exposure to more than moderate noise levels. (*Id*.) Further, the ALJ concluded that Plaintiff was capable of sustaining concentration persistence or pace, such that she could perform unskilled, simple, routine and repetitive work tasks, and although she was able to tolerate occasional changes in work tasks and occasional decision making, should not have any intense over-the-shoulder supervision nor be part of a team or engage in tandem tasks. (*Id*.)

The ALJ asked the vocational expert (VE) whether based on the Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could perform. The VE responded that Plaintiff could perform the requirements of the following occupations:

- Document preparer: 15,000 jobs nationally and 600 in Illinois
- Table worker: 3,000 jobs nationally and 300 in Illinois
- Inspector: 3,000 jobs nationally and 300 in Illinois

(AR 80.) Based on this testimony, the ALJ concluded that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy,"

and therefore a finding of "not disabled" was appropriate. (*Id.*)

**Analysis**

The Court reviews the ALJ's decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). "Although [the Court] will not reweigh the evidence or substitute our own judgment for that of the ALJ, [the Court] will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow . . . , [the] reviewing court[] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

    A.    <u>Did ALJ Build a Complete Record in Light of Plaintiff's Lack of Attorney Representation</u>?

Plaintiff first argues that the ALJ failed to build a complete record particularly given that Plaintiff did not have legal representation at the hearing. While a Social Security claimant has a statutory right to counsel, see 42 U.S.C. § 406, a claimant may waive that right provided a proper waiver has been obtained by the ALJ. *Wolf v. Colvin*, No. 15-CV-47-WMC, 2016 WL 5793801, at *2 (W.D. Wis. Oct. 4, 2016). "[A] proper waiver must contain an explanation of: (a) the benefits of counsel; (b) the possibility of free counsel or a contingency fee arrangement; and (c) the statutory 25% withholding limitation on attorneys' fees, including required court approval of the fees." *Id*. As recently noted by another court:

> If the ALJ does not obtain a valid waiver of counsel, the case must be remanded for a new hearing. At the same time, the district court can deny remand if satisfied "that the ALJ fully and fairly developed the record." *Binion v. Shalala*, 13 F.3d 243, 245-46 (7th Cir. 1994) (ALJ duty met if he "probes the claimant for possible disabilities and uncovers all of the relevant evidence"). In turn, a claimant can rebut the Commissioner's showing that the ALJ adequately developed the record by demonstrating prejudice or an evidentiary gap. *Id*. For example, prejudice may be shown if the ALJ failed to elicit all relevant information. *Id*.

*Wolf*, 2016 WL 5793801, at *2. "When a claimant appears without counsel, the ALJ must 'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts.'" *Weber v. Colvin*, No. 15 CV 1233, 2016 WL 5912897, at *5 (N.D. Ill. Oct. 11, 2016). "[A] significant, prejudicial omission is usually required before the court will find that the Commissioner failed to assist a pro se claimant in developing the record fully and fairly." *Id*.

In its opening brief, the government states without citation that because "plaintiff chose to have a non-attorney represent her, the ALJ was not required to obtain a waiver of representation." (Gov't's Resp., Dkt. #  , at 3.) The Court has found no authority to support this

3

proposition, nor do the parties cite to any in supplemental briefing requested by the Court.[2] It makes sense that if the Commission allows for a claimant to be represented by a non-lawyer, and a request for such representation is granted, then an express waiver of counsel is unnecessary. But because the Court finds that the case must be remanded for the reasons stated below, it declines to rule on this issue.

B.  Determination of Credibility[3]

Plaintiff contends that the ALJ erred in concluding that Plaintiff's statements were not entirely credible to the extent that they were inconsistent with the RFC assessment because this approach goes about the analysis backwards.[4] It is true that the boilerplate language contained in

---

[2] Assuming that the ALJ still had an obligation to inform Plaintiff of her right to counsel despite the presence of her representative, the parties do not point to nor has the Court identified any portion of the hearing transcript in which the issue of attorney representation was discussed. As far as the Court can tell, the ALJ did not ask Plaintiff whether she waived her right to counsel; she simply clarified that Plaintiff's representative was not a lawyer (AR 90), and then several questions later confirmed with Plaintiff's representative that he had reviewed the issues in the Notice of Hearing with Plaintiff and asked whether Plaintiff "waived further formal reading and advisement." The representative responded that Plaintiff did.

[3] As recently noted by another court:

> [L]ast year, the Administration updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective Mar. 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id*. at *1.
> . . .
> [For the reasons provided,] it is appropriate to evaluate Plaintiff's credibility argument in light of the new guidance the Administration has provided.

*Adamec v. Berryhill*, No. 15 C 11811, 2017 WL 1196920, at *5 (N.D. Ill. Mar. 31, 2017).

[4] The specific boilerplate language Plaintiff refers to is as follows:

> After careful consideration of the evidence, and explained in further detail below, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(AR 63.)

4

the ALJ's report has been criticized by the Seventh Circuit as "get[ting] things backwards." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "Nevertheless, [the Court] will uphold the credibility finding if the ALJ offers specific reasons to disbelieve the claimant's testimony." *Lott v. Colvin*, 541 F. App'x 702, 707 (7th Cir. 2013), as amended (Oct. 17, 2013). Thus, use of the boilerplate language in and of itself does not necessarily require reversal of the ALJ's determination.[5] However, the Court agrees with Plaintiff's assertion that the ALJ's conclusion that "there are no objective findings to support Plaintiff's alleged limitations resulting from fibromyalgia[6] is legally flawed." (Pl.'s Mem. Supp. Mot., Dkt. # 16, at 10.)

The ALJ briefly summarized Plaintiff's testimony as follows:

> The claimant stated that chronic fatigue syndrome, fibromyalgia, insomnia, interstitial cystitis, and untreated Lyme disease, and the cumulative effect of the medical conditions has resulted in a drastic reduction in her quality of life. She stated that she is unable to sit for more than thirty minutes at a time because her fatigue is so severe, and she cannot stand for more than five or ten minutes; she cannot drive safely, and she has severe limits in strength, energy and endurance. She also has hypersensitivity to sound and light. The claimant finds that her constant state of fatigue and insomnia affect concentration and memory.

---

[5] Plaintiff argues that even if one attributes use of the boilerplate language to sloppiness, "one cannot help but detect[] in the ALJ[] a certain predisposition to disbelieve the Plaintiff unless her testimony is consistent with the ALJ's opinions." (Pl.'s Mem. Supp. Mot., Dkt. # 16, at 10.) Without support from the record, however, the Court cannot evaluate the accuracy of this statement.

[6] As recently noted by the Seventh Circuit:

> "Fibromyalgia is a neurologic chronic health condition that causes pain all over the body and other symptoms. Other symptoms of fibromyalgia that patients most often have are: Tenderness to touch or pressure affecting muscles and sometimes joints or even the skin. Severe fatigue. Sleep problems (waking up unrefreshed). Problems with memory or thinking clearly. Some patients also may have: Depression or anxiety. Migraine or tension headaches. Digestive problems: irritable bowel syndrome (commonly called IBS) or gastroesophageal reflux disease (often referred to as GERD). Irritable or overactive bladder. Pelvic pain. Temporomandibular disorder—often called TMJ (a set of symptoms including face or jaw pain, jaw clicking, and ringing in the ears)."

*Kennedy v. The Lilly Extended Disability Plan*, No. 16-2314, 2017 WL 2178091, at *1 (7th Cir. May 18, 2017) (citation omitted).

5

(AR 62.) After reciting Plaintiff's medical history in detail, the ALJ stated that:

> The considerable treatment record shows that claimant has complained of a constellation of symptoms including pain, neurological manifestations, difficulty with concentration and memory, bladder urgency and pain[,] insomnia[,] and fatigue. After seeing numerous medical practitioners and specialists, very few positive findings were noted. She had a history of interstitial cystitis that responded well to therapy, there was mention of a history of degenerative disc disease involving the lumbar spine with epidural injections, and findings of mild degenerative changes in the cervical spine confirmed on MRI. However, there were few if any abnormalities noted on physical examination to corroborate the claimant's subjective complaints. Indeed, she displayed some mildly decreased grip and upper extremity strength noted during a consultative examination in February 2013, but there was nothing to indicate that the claimant was "bedridden" as has been alleged, such as muscle atrophy, profound weakness obvious somnolence or an impaired gait. The claimant then began treating with alternative medical specialists who initially concluded that the claimant had fibromyalgia and chronic fatigue. Dr. Edelman even reported tender points consistent with the diagnostic criteria for fibromyalgia, however no other positive findings were noted, such as synovitis, reduced range of motion or difficulty walking and the claimant's conditions steadily improved over time.
>
> In light of these minimal findings, and giving credit to the claimant's testimony, the undersigned finds that due to pain and some level of fatigue, the claimant would have difficulty performing most exertional tasks including lifting, carrying, standing and walking.

(AR 73.)

Nevertheless, as alluded to above, the ALJ rejected Plaintiff's purported limitations based on the "relatively weak medical evidence . . . and other factors discussed in this decision." (*Id*.) For example, the ALJ noted that Dr. Edelberg stated that Plaintiff was unable to work in any occupation but remarked that "other than identification of fibromyalgia tender points, there are no physical examination findings in Dr. Edelberg's treatment notes or other of record showing any persistent musculoskeletal or neurological deficits." (AR 40.) The ALJ concluded that "[t]here is nothing to suggest . . . that the claimant could not manage the minimal standing and walking tolerances of this work, that her fatigue is so profound that she leads a bed/chair existence as she has reported, or that her ability to sustain a continuous work schedule would be as compromised as alleged." (*Id.*) In support, the ALJ noted that:

> The physical examination findings that are available show no strength, neurological or ambulatory defects in the lower extremities. Furthermore, there are no diagnostic findings such as imaging of the lumbar spine or electromyography studies of the lower extremities to indicate significant

6

weakness or neurological manifestations that would suggest such enormously reduced capabilities in the lower extremities. In fact, there is no single record of first hand physical examination for more than a year, and prior clinical findings yielded relatively normal strength in the extremities, intact deep tendon reflexes and sensation, and normal gait. Any positive findings appear to be the exception as opposed to the rule.

(*Id*.)

While the ALJ's conclusion in this regard is perhaps true with respect to Plaintiff's other impairments, it ignores the accepted notion that "fibromyalgia often produce[s] pain and other symptoms out of proportion to the objective medical evidence, [and therefore] it is crucial that the disability adjudicator evaluate credibility with great care and a proper understanding of the disease." *Robinson,* 2017 WL 2215022, at *3 (internal citations and quotation marks omitted). The ALJ's reliance on the purported "conflicting" reports and the deficient objective medical evidence indicates a lack of understanding about the disease. The ALJ asserts that "[t]here is nothing to suggest . . . that [Plaintiff] could not manage the minimal standing and walking tolerances of [sedentary] work," noting that the "physical examination findings that are available show no strength, neurological or ambulatory deficits in the lower extremities." (AR 36.) However, "it is error to demand laboratory data to credit the symptoms of fibromyalgia—the crucial symptoms, pain and fatigue, won't appear on laboratory tests." *Id*. at 3.[7]

The ALJ considered claimant's daily activities and noted that Plaintiff testified that she is unable to do much work around the house and that in a "typical" day:

> [S]he wakes up[,] takes her medications, checks Facebook and emails, eats breakfast, lies on the couch watching television, uses her infrared sauna, takes a shower, rests, prepares lunch, rests, does restorative yoga, watches television, eats dinner[,] and then takes an Epsom salt bath. Periodically throughout the day, she pets her dogs.

---

[7] In any event, as noted by the ALJ, medical evidence in the record supports a finding of fibromyalgia and chronic fatigue syndrome. Dr. Edelberg identified persisting fibromyalgia tender points in May 2010, and noted muscle aching and extreme fatigue. (AR 513, 526.) He assessed fibromyalgia and chronic fatigue, characterized by widespread muscle pain and "profound fatigue." (AR 866-67.) In July 2010, he noted that Plaintiff reported that "pain has worsened in neck, low back, hands and feet," and that "TPs [tender points] remain." At the February 25, 2013 examination, the consulting physician reported that Plaintiff "has tenderness in all [but six of the eighteen] points consistent with fibromyalgia." (AR 644.) The ALJ acknowledged these findings in her opinion and states that "[t]he record in this case shows a history of widespread pain along with a diagnosis of fibromyalgia by a family practitioner Dr. Edelberg, basd on multiple positive fibromyalgia tender points." (AR 59.)

7

(AR 37.)  These types of tasks are not indicative of being able to travel to and perform work on a full-time basis.  In addition, the ALJ acknowledged that Plaintiff's husband "reported that his wife's fatigue was so severe he essentially had to do everything for her" and that "she would spend several days in bed; he had to carry her outside for fresh air; he had to bring her items if not within immediate reach and after five minutes of physical or mental exertion, she suffered immediate exhaustion." (*Id.*)  The ALJ also noted that Plaintiff's "mother in law[] reported that the claimant was dependent on family member[s] to do even the simplest of tasks including cooking, cleaning, shopping, [and] walking the dogs," and that the claimant spent the majority of her time lying down.  (AR 37-38.)  Further, the ALJ's opinion states that "[t]he claimant's mother similarly noted that the claimant went from being an active, health conscious individual to a ill young woman who complained of feeling tired and having pain." (AR 38.)  The ALJ also noted that Plaintiff's friend, Jennifer Franco, "described the claimant's fatigue," stated "there were times when [Plaintiff] could barely brush her own teeth," and communicated with Plaintiff via text because it took less effort than speaking on the telephone.  (*Id.*)

While on the one hand acknowledging Plaintiff's, her family's and her treater's comments indicating that Plaintiff experienced significant problems in her day-to-day functioning, the ALJ then discounted these accounts, stating that they "cannot be verified with a reasonable degree of certainty in light of conflicting reports."  (AR 38.)  Specifically, the ALJ was skeptical of Plaintiff's claim that she was "bedridden between June 2012 and October 2013, which meant that she did nothing but lie in bed, rising only to use the bathroom," and continued to be unable to do much due to overwhelming fatigue.  (*Id.* 74-75.)  According to the ALJ, this characterization did not reconcile with the fact that in December 2012, Plaintiff indicated that she could dress and feed herself and use the toilet with "no problem," (but noting at the same time that Plaintiff stated that she had to sit when showering, washing her hair and shaving.) (AR 297, Ex. 6E.)  Plaintiff further indicated in the same report that she could prepare her own simple meals 2-3 times per day, which included "putting yogurt in a bowl, opening a can of soup, frying an egg, washing fruit and vegetables, [and] making a bowl of cereal." (AR 298, Ex. 6E.)  The ALJ also noted that Plaintiff described doing "very light cleaning" for "5-10 minutes" "a few times per day," and that she left the house 2-3 times per week, shopped in stores and on the computer, and was able to pay bills and handle online finances.  (*Id*.)  But performing simple tasks a few times a day does not translate into working full time.  *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)  ("Roddy's inability to get through the day without lying down three to four times for an hour, or to complete even simple chores requiring standing, like cooking, does not indicate an ability to work even a sedentary job full-time.").

The ALJ also apparently discredited Plaintiff's and her family and friends' accounts because "despite ongoing limitations through the present, the 2014 treatment notes have shown increased ability to sleep, and despite [Plaintiff's] testimony to the contrary, seem to suggest that she has resumed physical activity including Yoga, Pilates and riding a bike." (*Id*.)  The ALJ appears to be referencing Progress Notes from March and May 2014 by Ruth Kriz, an Advanced Practice Registered Nurse ("APRN") in Washington D.C. who was treating Plaintiff via the internet and telephone.  In that report, Kriz's notes state that Plaintiff "[c]an now go out a few times/week – before was bedridden. . . .[s]ome exercise (yoga and pilates 3 days/week)." (AR

8

793, Ex. 16F). But the ALJ acknowledged that:

> When asked about current records showing that she has engaged in exercise, riding a bicycle and a physical rehabilitation program, [Plaintiff] denied doing any activities with regularity. She reported doing restorative yoga while lying down at home, attempting to ride her bicycle on a single occasion and designing her own physical therapy program at home.

(*Id*. 25.) Thus, from what the Court can discern, the ALJ's assertion that Plaintiff had "resumed physical activity" inaccurately summarizes, or at least overstates, the record evidence. In addition, the ALJ goes on to state that "[t]here are also references that she resumed driving in 2013 and 2014. . . . [a]lthough she testified that she has not driven since 2011." (*Id*.) Again, the source for this statement appears to be Kriz's Progress Note dated May 5, 2014, in which Kriz states "[d]riving again – hasn't for a long time previously." (AR 795.) Even if she had resumed driving occasionally does not mean that she is capable of doing so on a daily basis for work.

It is true, as the Commissioner summarizes in her brief, that Plaintiff's treating physicians indicated that Plaintiff at various times had reported improvements in her symptoms. (Def.'s Resp., Dkt. # 15, at 4-5). But, as the SSA itself has stated, "for a person with [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2p, VI.D. Nevertheless, while giving the treating physicians' conclusions little weight, the ALJ gave "some weight" to the one-time examinations conducted by the consultative physicians, but provided no reasons for doing so. (AR 41.)[8]

With respect to Plaintiff's mental health, the ALJ gave great weight to the "state agency psychological consultant's conclusion on reconsideration that the claimant retained the ability to perform simple one to two step tasks but would be inhibited in the ability to respond appropriately to supervisor criticism." (AR 79) (citing Ex. 4A). Plaintiff claims that the ALJ improperly relied on the absence of mental health treatment in reaching her conclusion about the type of work that Plaintiff could perform. Though failure to seek treatment is a valid consideration in determining credibility, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016). The

---

[8] "Because the symptoms and signs of FM may vary in severity over time and may even be absent on some days, it is important that the medical source who conducts the CE has access to longitudinal information about the person. However, we may rely on the CE report even if the person who conducts the CE did not have access to longitudinal evidence if we determine that the CE is the most probative evidence in the case record." SSR 12-2p, III.C.2.c. The ALJ did not state that the CEs exams were the most probative evidence in the case record.

9

ALJ acknowledged that Plaintiff stated she had limited financial resources and no insurance, but noted that Plaintiff still had money to put toward alternative medicine measures. Thus, the Court finds no error with respect to the ALJ's consideration of Plaintiff's mental health.

    C.    <u>Vocational Expert Testimony</u>

Finally, the Court notes that support for the VE's testimony regarding the number of jobs was nonexistent. "While a vocational expert is entitled to rely on h[is] expertise, []he must explain her reasoning, or else an ALJ's decision based on h[is] testimony cannot be said to be supported by 'substantial evidence,' as is required by the regulations." *Swaiss ex rel. Swaiss v. Berryhill*, No. 16 C 2536, 2017 WL 2952282, at *8 (N.D. Ill. July 10, 2017) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth."); *Hill v. Colvin*, 807 F.3d 862, 870 (7th Cir. 2015) (Posner, J. concurring) (noting "a persistent, serious, and often ignored deficiency in opinions by the administrative law judges of the Social Security Administration denying social security disability benefits . . . concern[ing] testimony by vocational experts employed by the Administration concerning the number and types of jobs that an applicant deemed not to be totally disabled could perform, and the evaluation of that testimony by administrative law judges.")). Here, there was no inquiry whatsoever into the VE's basis for his opinions on the number of jobs available in the economy for the proposed occupations.

It is true, as the government notes, that Plaintiff's representative did not challenge or question the VE as to the basis of his numbers, and certain cases from the Seventh Circuit have stated that in the absence of objection, the ALJ is entitled to rely on the VE's estimates. *See, e.g.*, *Liskowitz v. Astrue*, 559 F.3d 736, 745–46 (7th Cir. 2009) ("Where, as here, the VE identifies a significant number of jobs the claimant is capable of performing and this testimony is uncontradicted (and is otherwise proper), it is not error for the ALJ to rely on the VE's testimony."). It is not clear that the VE's conclusion was "otherwise proper" for the reason stated below. Moreover, the Court cannot ignore that the Commissioner has the burden at step five to demonstrate that Plaintiff is capable of performing any work in the national economy. The Social Security Act defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2). No inquiry was made into how the VE came up with the numbers of jobs available. *See Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015) ("There is no indication that the estimate of the number of jobs that the applicant in this case could fill (if the administrative law judge's estimate of his capacity to work is correct, as it may very well not have been) is . . . accurate.").

In addition, the Court notes that the last position, that of inspector, is defined by the Dictionary of Occupational Titles as:

> 726.684-110 TOUCH-UP SCREENER, PRINTED CIRCUIT BOARD
> ASSEMBLY (electron. comp.)

> Inspects printed circuit board (PCB) assemblies for defects, such as missing or damaged components, loose connections, or defective solder: Examines PCB's under magnification lamp and compares boards to sample board to detect defects. Labels defects requiring extensive repairs, such as missing or misaligned parts, damaged components, and loose connections, and routes boards to repairer. Performs minor repairs, such as cleaning boards with freon to remove solder flux; trimming long leads, using wire cutter; removing excess solder from solder points (connections), using suction bulb or solder wick and soldering iron; or resoldering connections on PCB's where solder is insufficient. Maintains record of defects and repairs to indicate recurring production problems. May reposition and solder misaligned components. May measure clearances between board and connectors, using gauges.

Http://www.govtusa.com/dot/dot07b.html (last visited 8/17/2017). While this might be a sedentary position, it seems likely that the detailed nature of the inspection work would require more than just occasional stooping. It is further questionable whether the position is "unskilled" or includes only "routine mental work tasks," as outlined by the ALJ. (AR 145.) If this occupation is excluded from the universe of jobs Plaintiff could perform, then a conclusion that a "significant" number of jobs that Plaintiff could perform exists in the national economy is less likely.

Last, Plaintiff contends that the ALJ failed to account for Plaintiff's limitations based on pain and fatigue when determining whether jobs existed in the national economy that she could perform. (Pl.'s Mem. Support Summ. J., Dkt. # 16, at 15.) The government responds that this is essentially a challenge to the ALJ's RFC finding, which is supported by substantial evidence. For the reasons stated above, the Court disagrees that the ALJ's findings regarding Plaintiff's RFC are supported by substantial evidence. In any event, the Court notes that hypothetical number three as posed by the ALJ to the VE specifically asked if jobs in the national or regional economy existed if the individual needed to take "regular rest breaks, at least 3 of them at least 15 minutes each throughout a typical workday, . . . in addition to typical breaks and lunches," and the VE responded, "I don't think it would actually be tolerated." (AR 146-47.) So, to the extent that the ALJ did not properly assess Plaintiff's RFC by failing to provide for rest breaks due to Plaintiff's pain and fatigue, the VE's response to hypothetical number three indicating that no jobs exist in the national economy in such a situation would appear to lead to a finding of disabled.

For the reasons stated above, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion, and Plaintiff's motion for summary judgment is granted.

**Date:** September 6, 2017

_____
**Ronald A. Guzmán**
**United States District Judge**